UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY GAYFIELD,

                    Plaintiff,

v.                                          Case No. 12-CV-375-JPS

MICHAEL ASTRUE,

                    Defendant.                  ORDER

The plaintiff, Anthony Gayfield, applied for disability insurance benefits and disability benefits on February 8, 2010, claiming disability since September 1, 2009. (Tr. 14). His application was denied both initially and upon reconsideration, after which he requested a hearing to be held by an Administrative Law Judge. (*See* Tr. 21). Administrative Law Judge Patricia Witkowski Supergan (the ALJ) held such a hearing on October 4, 2010, and thereinafter she denied his claims. (*See* Tr. 14–20). The Appeals Council denied Mr. Gayfield's request for review of the ALJ's decision, thus making that decision final. (Tr. 1–5). Mr. Gayfield thereafter appealed the decision to this Court; the parties have fully briefed the matter and the Court now renders its decision. (Docket #1, #10, #15, #16).

1.      BACKGROUND

Mr. Gayfield alleges that he suffers from several conditions, including back pain, heart problems, obesity, and fibromyalgia. Since early in 2009, he has undergone extensive medical treatment as a result of those problems. He alleges that his health issues made him unable to perform his job as an alcohol counselor and that they continue to prevent him from maintaining a job.

His odyssey began[1] on February 4, 2009, when he visited an emergency room complaining of back pain due to a herniated disk, arthritis pain, and right-side pain and numbness. (Tr. 275–76). The emergency room doctor administered two injections and prescribed Percocet and Robaxin to treat the pain. (Tr. 276). The doctor also offered pain management techniques and suggested that Mr. Gayfield visit his primary care physician. (Tr. 279–80).

Mr. Gayfield took the emergency room doctor's advice and visited his physician, Dr. Anubhua Jairam, on February 19, 2009. (Tr. 303–04). Dr. Jairam noted that Mr. Gayfield suffered from hypertension, acid reflux disease, fibromyalgia, sciatica, obesity, and carpal tunnel syndrome. (Tr. 304).

Dr. Jairam referred Mr. Gayfield to a neurologist, Dr. Jeffrey Rubin, who Mr. Gayfield visited on February 23, 2009. (Tr. 283–84). Dr. Rubin found evidence that Mr. Gayfield's carpal tunnel symptoms were likely related to nerve issues in Mr. Gayfield's wrists. (Tr. 283–84). Dr. Rubin performed an EMG on Mr. Gayfield and diagnosed "mild but definite right carpal tunnel syndrome" for which Mr. Gayfield would be a potential candidate for surgery. (Tr. 285).

Mr. Gayfield later visited Dr. Mark Waeltz regarding his wrist and back pain. (Tr. 295). Dr. Waeltz took an x-ray of Mr. Gayfield's back, which he stated showed degeneration in much of Mr. Gayfield's spine and diagnosed a "[f]lare-up of lumbar degenerative disc disease." (Tr. 296). To

---

[1]By no means was Mr. Gayfield in good health before this time; he had already undergone coronary artery bypass graft surgery and also neck surgery and was taking a number of medications. (*See* Tr. 278–81).

treat those issues, Dr. Waeltz suggested a lumbar corset and physical therapy. (Tr. 297).

Next, Mr. Gayfield met with Dr. Sunseet Kukreja for a cardiological consultation. (Tr. 315–16). Dr. Kukreja discovered high blood pressure and a heart murmur in his examination of Mr. Gayfield. (Tr. 316). Dr. Kukreja prescribed a number of medications and ordered further cardiac testing; when those tests were performed, they revealed diastolic dysfunction, atrial enlargement, and mitral regurgitation. (Tr. 316).

Mr. Gayfield then met with Dr. William Gans in April of 2009. (Tr. 321–34). At that time, Mr. Gayfield complained of low back pain and difficulty urinating; it was discovered that he had a small cyst. (Tr. 337). He underwent surgery to have that cyst removed on June 16, 2009. (Tr. 327).

Two months after his surgery, Mr. Gayfield was hospitalized for several days after reporting to the hospital with dizziness and chest pain. (Tr. 362). He received a heart catheterization showing calcification and occlusion of his arteries, but his condition improved and he was discharged from the hospital. (Tr. 362).

After being discharged from the hospital, Mr. Gayfield left his job due to a combination of factors—according to his testimony, he left partly due to his health problems and partly because his employer sought to terminate him due to an ongoing worker's compensation case he had filed against the employer. (Tr. 52).

Mr. Gayfield then filed his application for disability benefits and disability insurance benefits, which were denied. After the Appeals Council declined to review an ALJ hearing and decision, which had denied his request for benefits, Mr. Gayfield appealed to this Court seeking to have the

ALJ's decision overturned. The Court now turns to Mr. Gayfield's claims for reversal. (Tr. 1–5, 14–21).

2. DISCUSSION

   2.1    Standard of Review

The Court must accept any factual determinations made by the ALJ if such factual determinations are based on substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists when "a reasonable mind might accept [it] as accurate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (internal citations omitted). The Court cannot "decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the Commissioner," but "a mere scintilla of proof will not suffice to uphold the [Social Security Administration's] findings." *Id.* (internal citations omitted).

If, however, the ALJ's decision is based upon a legal error, the Court must overturn that decision. *Eads v. Secretary of Dept. of Health and Human Svcs.*, 983 F.3d 815, 817 (7th Cir. 1993); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Finally, if the Court concludes that the ALJ failed to build an "accurate and logical bridge" from the evidence to her conclusions, the Court should reverse that decision. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

   2.2    Substantive Analysis

Mr. Gayfield's briefs are lengthy and discuss much of the medical evidence of record. But, in reality, he makes only one valid argument, and that relates to his allegation that the ALJ erred in assessing Mr. Gayfield's credibility.

As part of the determination of a claimant's residual functional capacity (RFC) to work, the ALJ often assesses the claimant's credibility. As

background, in making an RFC determination, ALJs must evaluate the effect of a claimant's subjective symptoms, such as pain. *See, e.g.*, *Pope v. Shalala*, 998 F.2d 473, 481–82 (7th Cir. 1993) (citing *Veal v. Bowen*, 833 F.3d 693, 698 (7th Cir. 1987)). The ALJ evaluates subjective complaints using a two-step process: first, the ALJ determines whether objective medical evidence exists that could "reasonably be expected to produce the" symptoms; and, second, the ALJ must evaluate the intensity, persistence, and effects of the symptoms to determine how much they truly limit the claimant. *Pope v. Shalala*, 998 F.2d at 482 (citing 20 C.F.R. §§ 404.1529, 416.929). The ALJ often assesses the claimant's credibility in the second of those steps, in order to assign appropriate weight to the claimant's testimony regarding the intensity, persistence, and effects of his symptoms.

Given this process, the credibility determination is often extremely important to an ALJ's ultimate decision. The medical evidence often does not conclusively establish the extent to which a claimant's condition affects his ability to work (his RFC). Thus, the claimant's testimony may fill in that information gap—*but only so long as* the ALJ determines that such testimony is credible. In other words, if the ALJ determines that the claimant's testimony is credible and the testimony establishes extremely debilitating pain, then the ALJ's RFC determination must be limited to what the claimant can accomplish under the limits of that pain; on the other hand, if the ALJ determines that a claimant's testimony is not fully credible, then the ALJ need not fully factor the claimant's subjectively-described pain into the RFC determination. As Judge Posner has pointed out, this state of affairs encourages the unscrupulous claimant to exaggerate his symptoms of pain.

*Carradine v. Barnhart*, 360 F.3d 751, 753-54 (7th Cir. 2004).[2] The ALJ's task is further complicated by the fact that the regulations make clear that "'an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by

---

[2]In *Carradine*, Judge Posner recognized the extreme difficulty faced by an ALJ in making credibility determinations.

> Applicants for social security benefits who claim to be disabled from working because of extreme pain make the job of a social security administrative law judge a difficult one.… "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.1996). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater,* 67 F.3d 1553, 1561 (11th Cir.1995) (per curiam) (citations omitted). "Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition. To insist in such a case, as the social security disability law does not...that the subjective complaint, even if believed by the trier of fact, is insufficient to warrant an award of benefits would place a whole class of disabled people outside the protection of that law." *Cooper v. Casey,* 97 F.3d 914, 917 (7th Cir.1996) (citations omitted); see 20 C.F.R. § 404.1529(b)(2).

> But of course this dispensation invites the unscrupulous applicant to exaggerate his or her pain without fear of being contradicted by medical evidence. The administrative law judge must be alert to this possibility and evaluate the applicant's credibility with great care. His responsibility is all the greater because determinations of credibility are fraught with uncertainty…

*Carradine*, 360 F.3d at 753.

objective medical evidence.'" *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) (quoting SSR 96-7p(4)).

Given the difficult job of the ALJ, the Social Security Administration (SSA) has promulgated certain "templates"—essentially canned phrases that appear in most ALJ decisions. As relates to the credibility determination, there is such a template. *See, e.g., Bjornson*, 671 F.3d at 645. That template states "after considering the evidence of record the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible." *Id.* This template language takes care of a good portion of the two-step process in one fell swoop: first, it determines that the objective evidence could support the claimant's alleged symptoms; and, second, it goes on to limit the weight given to the claimant's testimony in the assessment of the claimant's subjective symptoms. In that way, it is likely viewed as useful by ALJs and the SSA. *See id.* However, the Seventh Circuit and other circuits have repeatedly criticized the use of that language as "meaningless boilerplate," which provides no meaningful information to a reviewing court. *Id.* (citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Martinez v. Astrue*, 630 F.3d 693, 696–97 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)).

Recently, the SSA altered its template to clarify that, when the language is employed, the ALJ is determining that a claimant's statements are not credible "…to the extent they are inconsistent with the [ALJ's own] RFC determination." *Bjornson*, 671 F.3d at 645. Again, the Seventh Circuit

(specifically Judge Posner) took issue with such language, pointing out that an ALJ's credibility determination must necessarily play into his or her RFC determination under the regulations, while the template language "implies that the determination of the credibility is deferred until the ability to work is assessed without regard to credibility." *Id.*, at 645-46. In reality, an ALJ's employment of the template language into a decision leads to a tautology: stating that any testimony is not credible insofar as it differs from an RFC determination while simultaneously relying on that lack of credibility to reach the very RFC determination with which the testimony is allegedly inconsistent.

The Seventh Circuit has clearly determined that such language is meaningless boilerplate, *see, e.g.*, *id.*, and the Court agrees. The template language provides the Court with absolutely no information as to what the ALJ relied upon in reaching her conclusion.

Of course, a version of that language was used by the ALJ in this case. Here, the ALJ stated that,

> [a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 18). The words may not be exactly the same as the template language, but the gist of the language clearly tracks—and it is completely meaningless boilerplate.

If that language alone constitutes the ALJ's full assessment of Mr. Gayfield's credibility, then the Court should vacate the ALJ's decision as

being in error. The ALJ necessarily needed to determine Mr. Gayfield's credibility to make the RFC determination, so if the ALJ erred in assessing that credibility, such error is harmful and reversible. (*See* Tr. 18 ("whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements…")). Furthermore, if the ALJ has not provided substantial evidence for her conclusion or built a logical bridge from the evidence to her conclusion, then the Court should reverse that conclusion. *See, e.g.*, 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673. Given the Court's discussion of the template language above, it is clear that reliance on the template language alone to make a credibility determination would mean the ALJ failed to provide such substantial evidence or logical bridge between the evidence of record and her conclusion.

So, the issue is whether the ALJ relied on the template language alone or set forth some evidence that could support her conclusion that Mr. Gayfield's testimony lacked credibility. The Court concludes that the ALJ relied on her use of the template language, as opposed to evidence that would go to Mr. Gayfield's testimony—therefore, the Court must reverse the ALJ's decision for its credibility determination, which was in error.

After using the template language, the ALJ goes on to discuss the medical evidence of record and how that evidence differs from Mr. Gayfield's testimony as to his symptoms. (Tr. 18–19). But the ALJ cannot simply disregard Mr. Gayfield's testimony for failure to match with the medical evidence; rather, the ALJ *cannot* reject Mr. Gayfield's testimony "solely because they are not substantiated by objective medical evidence."

SSR 96-7p(4). The ALJ did just that here: she rejected Mr. Gayfield's testimony for its failure to be substantiated by the medical evidence, without providing any other reason to doubt the veracity of Mr. Gayfield's statements.

Thus, the ALJ's only statements as related to the credibility determination are the meaningless boilerplate and the discussion of the inconsistencies between Mr. Gayfield's testimony and the medical evidence. Both of those items are insufficient to support the rejection of Mr. Gayfield's testimony.

Furthermore, it should be noted that Mr. Gayfield's testimony was not even truly inconsistent with the medical evidence. Rather, as the ALJ stated, the medical and objective evidence simply did not go so far as the alleged symptoms to which Mr. Gayfield testified. (Tr. 18–19) ("there is no support for his testimony about the limitations he has in writing and computer use"; "there is nothing in the medical evidence of record that precludes claimant from performing sedentary work due to his coronary artery disease or obesity"; the claimant's alleged minimal activities of daily living and social activities "cannot be corroborated independently and more significantly, there is no objective support or basis in the record for his reports").

Perhaps the only piece of evidence that could go to Mr. Gayfield's credibility is the fact that he did not receive carpal tunnel surgery despite his doctor's statement that he would be a "reasonable candidate for surgical decompression of the right carpal tunnel." (Tr. 18 (citing Ex. 2F [Tr. 285])). Mr. Gayfield's failure to seek that treatment could, indeed, imply that his wrist function was not quite as bad as he had described it. But, as the ALJ acknowledged, Mr. Gayfield's lack of insurance could also very well explain

his decision not to receive the surgery. (Tr. 18). And, while the ALJ points out that a lack of insurance did not prevent Mr. Gayfield from receiving treatment for kidney stones, the ALJ also acknowledges something that undercuts the importance of Mr. Gayfield's electing kidney stone treatment while neglecting carpal tunnel surgery: kidney stones present an acute—and extremely painful—condition. (Tr. 18). It would be totally understandable for an individual without health insurance to be forced by extreme pain to take the step of receiving treatment for his kidney stones. Furthermore, as was not acknowledged by the ALJ, kidney stone treatment could very well be less expensive than carpal tunnel surgery. Thus, the Court must conclude that the only potentially-meaningful piece of evidence relied upon by the ALJ in determining Mr. Gayfield's credibility is, in reality, totally irrelevant to that determination.

Having concluded that the ALJ relied solely upon meaningless boilerplate, medical evidence that should not have been employed to rule out the consideration of Mr. Gayfield's testimony, and evidence that is ultimately irrelevant, the Court must conclude that the ALJ's credibility determination was in error. *See, e.g.*, *Bjornson*, 671 F.3d at 645–46; SSR 96-7p(4).

3. CONCLUSION

The Court has concluded that the ALJ made her credibility determination in error. That error now requires the Court to vacate the decision of the ALJ and remand the matter for further proceedings.

Accordingly,

IT IS ORDERED that the opinion of the ALJ be and the same is hereby VACATED and REMANDED for further proceedings consistent with this opinion.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of November, 2012.

BY THE COURT:

*[signature]*

J.P. Stadtmueller
U.S. District Judge

Page 12 of 12

Case 2:12-cv-00375-JPS   Filed 11/09/12   Page 12 of 12   Document 17